Filed 9/7/16  P. v. Thurman CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TERESA JOAN THURMAN,<br><br>    Defendant and Appellant. | B265150<br><br>(Los Angeles County<br>Super. Ct. No. MA064669) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Carol Koppel, Judge.  Affirmed.

Joy A. Maulitz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Tannaz Kouhpainezhad, Deputy Attorney General, for Plaintiff and Respondent.

————————————

A jury convicted Teresa Joan Thurman (Thurman) of possession of a firearm and ammunition by a felon, and she appeals.

An information filed January 27, 2015 charged Thurman with one count of possession of a firearm by a felon, in violation of Penal Code section 29800, subdivision (a)(1),[1] and one count of possession of ammunition, in violation of section 30305, subdivision (a)(1). The information alleged that Thurman had been convicted of a serious and/or violent felony within the meaning of sections 1170.12, subdivision (b) and 667, subdivisions (b–j), and had served one prior prison term within the meaning of section 667.5, subdivision (c). The information also charged Thurman's husband, Robert Nicely (Nicely), with two similar counts. Thurman pleaded not guilty and denied the allegations.

Thurman and Nicely were tried together. A jury convicted Thurman on both counts, and she admitted the truth of the prior conviction allegations. The trial court sentenced Thurman to two years eight months in state prison, and Thurman appealed.

## DISCUSSION

At trial, Los Angeles County Sheriff's Department Deputy Jorge Caamal testified that at 8:00 a.m. on Wednesday, October 29, 2014, he and a team of deputies went to 45029 17th Street in Lancaster to conduct a lawful search. When members of the team knocked on the front door and announced their presence, through a front bedroom window Deputy Caamal saw Nicely get out of bed, turn around, and run out toward the back side of the house. Deputy Caamal notified the team that Nicely had run toward the back of the house. Deputy Cynthia Mejia testified she was stationed behind the house when a bedroom sliding glass door opened and Nicely ran out, barefoot and wearing pajama bottoms. She and another deputy detained Nicely.

Thurman came to the front door with an elderly woman and two dogs. When a deputy asked Thurman if there were other people or firearms in the house, she answered that Nicely was in his bedroom, her son was asleep in the back bedroom, and her son had

---

[1] All further statutory references are to the Penal Code.

guns. The deputies entered the house for a protective sweep and found Thurman's son Cody Westfall (Cody) sleeping in bed in the back bedroom, which had a sliding glass door to the outside. A shotgun was propped up next to the bed, and more rifles were in rifle bags on the other side of the bed. The semi-automatic shotgun propped up against the wall in Cody's bedroom did not have a gun lock, and had two rounds in the magazine. A deputy picked up the rifle bags from the other side of the bed, opened them, and rendered all the firearms safe. The deputies recovered a total of six operable firearms from Cody's bedroom. Another deputy found a box containing live ammunition to the left of the door; the deputy did not know whether any of the bullets would fit any of the guns recovered, as he did not closely examine the ammunition.

In the nightstand next to the bed in the master bedroom, deputies found a small handgun loaded with five live rounds under some junk in the top drawer. Thurman's cell phone was on the nightstand. Men's clothing was on the floor next to the side of the bed by the window. Nicely said he knew nothing about the handgun and slept on the opposite side of the bed from the nightstand.

For the defense, Cody testified that he was Thurman's son and had lived in the back bedroom of the house on 17th Street for three years. He kept the bedroom door closed most of the time. The door locked only from the inside, and Cody almost always locked it when he was in his room, and kept the sliding door to the outside closed and locked. Thurman had never been inside his bedroom and would stand in the doorway to talk to him. Cody inherited the six shotguns, a handgun, and the box of ammunition from his grandfather in 2011. After his bedroom flooded in October 2014, he moved the guns and the ammunition box out of his closet and close to his bed. Neither Thurman nor his stepfather Nicely knew he had seven firearms in the house.

On the day of the search, an officer showed him an empty handgun case, and Cody told him the handgun belonged to him and was in the night stand of his mother's bedroom. Cody had put the handgun in the back of the top drawer in Thurman's night stand under "some pencils, junk." He had slept in Thurman's bedroom when she was away the weekend of October 24-26, 2014 so that he could be in a "central command"

3

location to take care of his grandmother, who also lived in the house. He brought the handgun with him and put it in the nightstand for protection, without telling Thurman, and did not remember taking it out. Cody also testified he was cleaning the handgun in Thurman's bedroom when he was called away. He left it in the drawer because he was in a hurry and forgot it was there.

Amy Taylor, Thurman's daughter, testified that she lived at the 17th Street address. She had not been inside Cody's bedroom. She had never seen firearms in the house, did not remember seeing a blue metal box, and had never seen Thurman hold or fire a gun. Thurman's other daughter Ashley Mendoza testified that she was at her mother's house on 17th Street at least four times a week. Cody had inherited firearms from his grandfather. Since Cody had moved into the house at the end of 2012, she had not seen any firearms or ammunition there, and had not seen Thurman hold or fire a gun, handle ammunition, or even be in the presence of a gun.

## DISCUSSION

### I.      Sufficient evidence supported Thurman's convictions for felon in possession of firearms and ammunition.

Thurman argues there is insufficient evidence that she possessed firearms or ammunition, as there was no evidence that she constructively possessed the shotguns and ammunition found in Cody's room, or that she knew of or constructively possessed the handgun found in her nightstand drawer. We disagree.

We review to determine whether substantial evidence "that is reasonable, credible, and of solid value" supports Thurman's convictions. (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1416.) We accept all logical inferences the jury may have drawn from circumstantial evidence. (*Ibid.*)

The elements of felon in possession are conviction of a felony and knowing possession, custody, or control of a firearm. (*People v. Blakely* (2014) 225 Cal.App.4th 1042, 1052.) "'A defendant possesses a weapon when it is under his dominion and control. [Citation.] A defendant has actual possession when the weapon is in his immediate possession or control. He has constructive possession when the weapon,

4

while not in his actual possession, is nonetheless under his dominion and control, either directly or through others. [Citations.]' [Citation.] 'Implicitly, the crime is committed the instant the felon in any way has a firearm within his control.'" (*Ibid*.) "'The inference of dominion and control is easily made when the contraband is discovered in a place over which the defendant has general dominion and control: [for example] his residence.'" (*People v. Johnson* (1984) 158 Cal.App.3d 850, 854.) "[T]he choice among the several permissible inferences from circumstantial evidence was for the trier of fact, not us." (*People v. Jenkins* (1979) 91 Cal.App.3d 579, 584.)

Thurman told the deputies that Cody had guns. The deputies found seven firearms and a box of ammunition in Thurman's home, including a loaded handgun in the top drawer of the nightstand next to Thurman's side of the bed in the master bedroom. Her cell phone was on the nightstand. The loaded handgun in her nightstand drawer was within her easy reach and under her dominion and control. Although Cody testified that he had placed it in her nightstand drawer the weekend before the search, the jury was entitled to disbelieve him and draw the inference that Thurman knew the loaded handgun was in the drawer. The evidence regarding the loaded handgun was sufficient to support Thurman's conviction of possession of a firearm.

Further, Thurman told the deputies that she knew Cody had firearms, and the deputies found six shotguns in Cody's bedroom. "Possession may be physical or constructive, and more than one person may possess the same contraband. [Citation.] Possession may be imputed when the contraband is found in a place which is immediately accessible to the joint dominion and control of the accused and another." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410.) Cody testified that Thurman stood in the door to talk to him, and the firearms were in plain sight. Although Cody testified he kept the door locked when he was inside the room, he could not lock the door from outside, and Thurman had access to the bedroom when Cody was not home and inside the bedroom. The six shotguns were in Thurman's home, over which she had general dominion and control. The jury was entitled to infer that she had joint dominion and control over the firearms in Cody's room.

5

The evidence was also sufficient to support Thurman's conviction of possession of ammunition. The metal box of ammunition was also in plain sight in Cody's room.[2] Like the shotguns, substantial evidence supported the inference that the ammunition was under Thurman's and Cody's joint dominion and control.

## II. The trial court did not abuse its discretion in refusing to give the defense's requested pinpoint instruction.

Nicely's counsel, joined by Thurman's counsel, requested that the trial court add a specialized pinpoint instruction regarding constructive possession to CALCRIM Nos. 2511 and 2591, and the trial court denied the request, concluding that the standard instructions were "enough." The proposed language stated: "To establish constructive possession the prosecution must prove that the defendants knowingly exercised a right to control the firearm(s) [or ammunition], either directly or through another person. [¶] Constructive possession is established where a person knowingly exercised dominion and control over the item. But mere proximity to the weapon [or ammunition] standing alone is not sufficient evidence of possession even if the defendants knew the firearm(s) [or ammunition] was/were in the room. [¶] The possibility that defendants might have had the right to exercise control over the firearm(s) [or ammunition] does not by itself provide a basis to infer the defendants had the right to control it. That an event could have

---

[2] The information alleged that Thurman possessed "ammunition and reloaded ammunition." To the extent that her conviction of possession of ammunition was based on reloaded ammunition in the same firearm she possessed (such as the five live rounds loaded in the handgun in her nightstand drawer), section 654 would apply and would require Thurman's concurrent sentence on the ammunition to be stayed. "[T]here may be instances when multiple punishment is lawful for possession of a firearm and ammunition, . . . [but when] all of the ammunition is loaded into the firearm, an 'indivisible course of conduct' is present and section 654 precludes multiple punishment." (*People v. Lopez* (2004) 119 Cal.App.4th 132, 138.) Where "defendant's convictions were based on a single act, section 654 prohibits multiple punishment." (*People v. Jones* (2012) 54 Cal.4th 350, 360.) In this case, however, not all the ammunition was loaded into a firearm. Thurman's possession of the blue box containing additional ammunition was a separate act from her possession of the loaded handgun and the shotguns, and section 654 does not mandate that her sentence for possession of ammunition be stayed.

6

happened however does not by itself support a deduction or inference it did happen." The proposed language is substantially similar to language in *People v. Sifuentes*, *supra*, 195 Cal.App.4th at pages 418–419.

A trial court may properly refuse a pinpoint instruction if such an instruction would merely be duplicative or potentially confusing, or if the instruction is not supported by substantial evidence. (*People v. Moon* (2005) 37 Cal.4th 1, 30.) The trial court in this case suggested the pinpoint instruction was duplicative and the standard instructions sufficed, and we agree. The standard instructions explained that to be guilty of possession the defendant must know that she possessed or had under her custody and control the firearms and ammunition, and addressed constructive possession as to both possession of a firearm and possession of ammunition: "Two or more people may possess something at the same time. [¶] A person does not have to actually hold or touch something to possess it. It is enough if a person has control over it or the right to control it, either personally or through another person." This language informed the jury that mere proximity was not enough even if the defendant knew the firearms or ammunition were nearby (as stated in the proposed pinpoint instruction); the defendant must have had control, or the right to control, the firearm or ammunition.

Further, *People v. Sifuentes*, *supra*, 195 Cal.App.4th 1410, the source of the instruction's language, addressed a very different set of facts. Sifuentes, a convicted felon, had rented a motel room. When officers entered, he was lying on the bed nearest the door; another defendant (Lopez) knelt on the floor on the far side of the second bed. The officers found a loaded handgun under the mattress next to Lopez. (*Id.* at pp 1413–1414.) At trial, a gang expert testified that he believed Sifuentes and Lopez were active members of the same gang, and he believed the gun was a "'gang gun,'" although no direct evidence tied the gun to gang members other than Lopez, and he did not testify that all gang members would have a right to control such a gun. (*Id.* at pp. 1414–1416, 1419.) The court of appeal concluded there was no substantial evidence that Sifuentes had the right to control the gun under Lopez's mattress, and reversed Sifuentes's conviction, in the process stating (in language similar to the requested pinpoint instruction): "The

7

possibility Sifuentes might have had the right to exercise control over the gun does not by itself provide a basis to infer he had the right to control it. (See *People v. Moore* (2011) 51 Cal.4th 386, 406 ['That an event *could* have happened, however, does not by itself support a deduction or inference it did happen.' . . . ]" (*Id.* at p. 1419.) Here Thurman told the officers she knew Cory had guns; the six shotguns and the ammunition were in her home (allowing an inference that she had dominion and control) and in plain sight in a room that could be locked only when Cory was inside; and a loaded handgun was in her nightstand drawer. The jury was instructed that the prosecution must prove Thurman possessed at least one of the seven firearms, and that the jury must all agree which firearm she possessed. The evidence of constructive possession was so strong, there is no reasonable probability the jury would have found otherwise if it had heard the pinpoint instruction, and so the failure to give the instruction would be harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 23; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


LUI, J.


8